AO 106 (REV 4/10) Application for a Search Warrant

AUSA Chester Choi, (312) 697-4037

**FILED**
**2/17/2022**
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Search of:

Case Number: 22M130

The two cellular telephones, further described in
Attachment A

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, David LaMonte, a Postal Inspector of the U.S. Postal Inspection Service, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

**See Attachment A**

located in the Northern District of Illinois, there is now concealed:

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is evidence and instrumentalities.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841 and 846 | narcotics |

The application is based on these facts:

**See Attached Affidavit**,

Continued on the attached sheet.

_____
*Applicant's Signature*

DAVID LAMONTE, Postal Inspector
U.S. Postal Inspection Service
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: February 17, 2022          10:20am          _____
*Judge's signature*

City and State: Chicago, Illinois          JEFFREY COLE, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT      )
                                        )
NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, David LaMonte, being duly sworn, state as follows:

1.      I am a Postal Inspector with the U.S. Postal Inspection Service. I have been so employed since approximately January 2022. From 2014 to 2022, I was a Special Agent for the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives. From 2008 to 2014, I was a Special Agent for the U.S. Secret Service.

2.      As part of my duties as a USPIS Postal Inspector, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. Throughout my career as a federal agent, I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

3.      I have received training in the area of narcotics investigations, money laundering, financial investigations and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4.     I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence, searched for, and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants.

5.     This affidavit is made in support of an application for a warrant to search,a black One Plus cellular telephone in a black and grey case, bearing IMEI number 990017114353440 ("**Subject Phone 1**") and a grey T-Mobile cellular telephone with a cracked screen, bearing IMEI number 015727005663399 ("**Subject Phone 2**") (collectively, the "**Subject Phones**") for evidence and instrumentalities described further in Attachment B, concerning narcotics offenses, in violation of Title 21, United States Code, Sections 841 and 846.

6.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts

that I believe are sufficient to establish probable cause to believe that evidence and instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, are located within the **Subject Phones**.

## I. FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PHONES

7.      As explained below, on February 14, 2022, during the execution of a search warrant and the subsequent arrest of FLOYD SUGGS, law enforcement recovered two cellular telephones – namely, a black One Plus cellular telephone, bearing IMEI number 990017114353440 and a grey T-Mobile cellular telephone with a cracked screen, bearing IMEI number 015727005663399 ("the **Subject Phones**").

### A.      October 2021: One package was sent to 1031 North Massasoit Avenue, Chicago, Illinois that had characteristics consistent with parcels containing controlled substances

8.      According to United States Postal Service ("USPS") records, on or about October 4, 2021, a Priority Mail parcel bearing tracking number 9505 5128 5587 1277 5874 87 ("Parcel 1") was shipped to "Steve Flower" at 1031 North Massasoit Avenue, Chicago, Illinois ("the Suggs Residence"). Parcel 1 was sent from Tucson, Arizona 85706 and had a return address of "Diana Flower 848 W Calle Ramona Tucson Arizona 85706." Parcel 1 bore $21.95 in postage and weighed approximately 3 pounds and 14 ounces.

9.      I observed characteristics about the parcel that, in my training and experience, can be consistent with parcels containing controlled substances.

10.     First, I ran the sender and recipient names and addresses on the parcel through a law enforcement database. According to a USPS database, the sender address is not a valid address. Based on my training and experience, fictitious sender names and addresses can indicate that the sender or receiver does not want to be associated with the parcel.

11.     According to USPS records, the parcel was delivered to the Suggs Residence on or about October 7, 2021.

**B.      February 9, 2022: Postal Inspectors Discover Narcotics in the Subject Parcel Addressed to the Suggs Residence**

12.     On or about February 9, 2022, I inspected the Subject Parcel at the USPS Processing and Distribution Center in Chicago, Illinois. According to USPS records, on or about February 7, 2022, the Subject Parcel was shipped from Nogales, Arizona 85621. According to the shipping label affixed to the Subject Parcel, the Subject Parcel is addressed to "Steve Fowler" at the Suggs Residence. The return address on the Subject Parcel is "Clarissa Stevens 701 Calle Milu Tucson, AZ 85706". The Subject Parcel bears $10.90 in postage, measures approximately 15 inches by 11.625 inches by 2 inches, and weighs approximately 14.9 ounces. The Subject Parcel was sent utilizing U.S. Priority Mail.

13.     I observed several characteristics about the Subject Parcel that, in my training and experience, can be consistent with parcels containing a controlled substance.

14.     I ran the sender and recipient names and addresses on the Subject Parcel through a law enforcement database. I discovered that neither the sender's or the recipient's names are associated with their respective addresses. Based on my training and experience, fictitious sender and recipient names can indicate that the sender and recipient do not want to be associated with the parcel.

15.     Moreover, the parcel was paid for in cash. Based on my training and experience, individuals often pay in cash in order to disassociate themselves from a parcel containing narcotics.

16.     Based on my training and experience, the combination of these characteristics led me to investigate further by calling in a narcotics dog to perform further examination of the Subject Parcel.

17.     On or about February 9, 2021, I arranged for an Elmhurst Police Department officer and his canine partner, "Ozy," to meet with and examine the Subject Parcel.

18.     On February 9, 2022, at the USPS International Service Center in Chicago, Illinois, I arranged a controlled substance detection test by placing the Subject Parcel among approximately 10 other parcels in the workroom area. I then witnessed Ozy examine the parcels and observed Ozy alert by laying down next to the Subject Parcel.  Ozy did not alert to any of the other parcels. The Canine Officer informed me that Ozy's actions indicated the presence of narcotics and/or controlled substances in the Subject Parcel. I then took custody of the Subject Parcel.

5

19. On February 9, 2022, Magistrate Judge Beth M. Jantz authorized a search warrant (22 M 106) to search the Subject Parcel.

20. On or about February 9, 2022, Postal Inspectors executed the warrant and opened the Subject Parcel in Chicago, Illinois. The Subject Parcel contained a small Priority Mail flat rate box sealed with clear tape. Inside the flat rate box was a bundle wrapped in white paper and sealed with clear tape. Inside the white paper bundle was a black tissue bundle sealed with clear tape. Inside the black tissue bundle was a white tissue bundle sealed with clear tape. Inside of the white tissue bundle were three clear plastic Zip-Loc bags. All three Zip-Loc plastic bags contained circular blue pills. The pills were stamped with the letter "M" enclosed in a square on one side and the number "30" on the other side.

21. Postal Inspectors removed one pill from one of the Zip-Loc bags, which field tested positive for the presence of fentanyl. The total combined weight of the blue pills from all three Zip-Loc bags, including packaging, was approximately 364.2 grams.

22. On or about February 9, 2022, the Subject Parcel and its contents, were seized by Postal Inspectors and securely stored in Chicago, Illinois.

23. Based on my training and experience, the large quantity of the blue pills contained in the Subject Parcel indicates that the pills are intended for distribution rather than personal consumption.

24.     Based on my training and experience, the packaging of the blue pills inside multiple layers of wrapping is consistent with the way drug traffickers package controlled substances in an effort to avoid detection.

25.     On or about February 11, 2022, Magistrate Judge Beth M. Jantz authorized a warrant to install a tracking device in the Subject Parcel (22 M 111), and an anticipatory warrant to search the Suggs Residence (22 M 112), conditioned on the Subject Parcel entering and being opened in the Suggs Residence.

**C.      February 14, 2022: Execution of the Tracker Warrant and Search Warrant at the Suggs Residence**

26.     On or about February 14, 2022, pursuant to the warrant described in Paragraph 23, law enforcement installed a GPS tracking device, an optical detection device, and a filament device inside the Subject Parcel. Law enforcement also rewrapped the Subject Parcel to give it the appearance that it was not opened and replaced the approximately 364.2 grams of blue pills containing fentanyl with a sham substance. Additionally, law enforcement dusted the bags of sham substance and the paper wrappings around the bags of sham substance with dye powder before placing it inside the Subject Parcel. Based on my training and experience, I am aware law enforcement often dusts the sham contents of parcels prior to a controlled delivery with a dye powder that is initially barely visible but later stains purple upon contact with moisture, allowing for later identification of any individual(s) who handled the contents of the parcel.

27.     That same day, at approximately 11:20 a.m., an undercover law enforcement agent ("UC") made a controlled delivery, leaving the Subject Parcel outside the front door of the Suggs Residence. Approximately two minutes later, Individual A retrieved the Subject Parcel from the front door and brought it inside the Suggs Residence.

28.     From approximately 11:22 a.m. until 2:38 p.m., there were no motion alerts on the Subject Parcel.

29.     At approximately 2:38 p.m., an individual, later identified as SUGGS[1], entered the Suggs Residence through the front door. Law enforcement received a motion alert for the Subject Parcel immediately after SUGGS entered the Suggs Residence.

30.     At approximately 2:41 p.m., the trigger devices inside the Subject Parcel emitted a signal to law enforcement indicating the Subject Parcel had been opened.

31.     Approximately three minutes later, law enforcement approached the Suggs Residence, knocked on the front door of the first floor, and announced their presence. After approximately one minute and no answer from inside the Suggs Residence, law enforcement made entry into the Suggs Residence and executed the search warrant for the Suggs Residence.

---

[1] Law enforcement identified SUGGS as follows: After SUGGS was detained, law enforcement recovered an Illinois Driver's License from SUGGS' pocket in the name of "Floyd Suggs". The image on the driver's license photo resembled SUGGS. SUGGS responded "yes" when law enforcement asked if his name was Floyd Suggs.

32.     A short time later, law enforcement encountered SUGGS on the rear interior stairs of the Suggs Residence. Law enforcement announced their presence and ordered SUGGS to stop. Law enforcement observed SUGGS' hands appeared to be stained purple, consistent with SUGGS having touched the dye powder dusted on the packaging of the sham substance from inside the Subject Parcel. SUGGS ignored law enforcement commands and fled up the stairs into the second floor area and locked the door. Law enforcement subsequently made entry into the second floor area and detained SUGGS. Law enforcement confirmed SUGGS' hands and clothes were stained purple, consistent with having touched the dye.

33.     During a search incident to arrest of SUGGS, law enforcement recovered **Subject Phone 1** from SUGGS' pants pocket.

34.     During law enforcement's search of the Suggs Residence, law enforcement recovered the opened Subject Parcel and packaging material from inside the Subject Parcel on the bedroom floor on the second floor of the Suggs Residence. In that same room, law enforcement also recovered **Subject Phone 2** located on a box next to paper that was used to wrap the sham substance in the Subject Parcel. Immediately next to the box where **Subject Phone 2** was recovered was the opened internal box from inside the Subject Parcel. Law enforcement also observed the sham substance on the ground of the rear stairwell and in the second floor kitchen of the Suggs Residence.

35.     During the search, law enforcement also found, among other things:

a.    White powder on the rim of the toilet in the bathroom on the second floor of the Suggs Residence. The white powder field-tested positive for the presence of fentanyl.

b.    Numerous plastic bags with white powder residue that field tested positive for the presence of fentanyl found in a closet next to the kitchen on the second floor of the Suggs Residence.

c.    Numerous pieces of paper that contained numbers, calculations, and names found in the kitchen on the second floor of the Suggs Residence. Based on my training and experience, these papers appeared to be ledgers associated with drug trafficking activity.

d.    A handwritten note with information about the effects and characteristics of fentanyl found in the kitchen on the second floor of the Suggs Residence.

e.    Numerous receipts for money transfer services found in the living room area of the second floor of the Suggs Residence. A preliminary review of the receipts revealed SUGGS' name as the sender of money to individuals located in Arizona. The Subject Parcel and Parcel 1 were both sent to the Suggs Residence from Arizona.

f.    Miscellaneous documents and mail that contained SUGGS's name, including what appeared to be a receipt for rent payment for the second floor of the Suggs Residence, with payment made to Individual A.

10

36. At approximately 3:00 p.m., law enforcement interviewed Individual B, a resident of the first floor of the Suggs Residence. According to Individual B, SUGGS is the sole tenant of the second floor of the Suggs Residence and pays rent to Individual A, the spouse of Individual B.

37. Since February 14, 2022, the above-described **Subject Phones** have been in the government's custody.

38. At the time of search and subsequent arrest of SUGGS, data stored on the **Subject Phones**, including text and voice mail messages sent and received by the defendants during the course of the commission of the narcotics offenses, were not known.

## II. BACKGROUND ON CELL PHONES AND NARCOTICS TRAFFICKING

39. Based upon my training and experience, I know that cellular phones may contain relevant evidence of the narcotics offenses, including text messages made or received from the **Subject Phones** that are located in the memory of the **Subject Phones**, which messages may provide information regarding the identities of, and the methods and means of operation and communication used by, the participants in the narcotics offenses. Moreover, digital photographs located in the memory of the **Subject Phones** may contain images of the tools or participants involved in the narcotics offenses. Moreover, digital photographs stored in the **Subject Phones** may contain images of the user of the **Subject Phones**, the user's associates (including persons involved in or knowledgeable about the subject

offenses), places frequented by the user of the phone leading up to and during the subject offenses, and locations and instrumentalities used in committing the subject offenses.

40.     In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

41.     Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both

metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

42. The cellular telephone numbers associated with the **Subject Phones** are not known. Based upon my training and experience, I know that information maintained by cellular telephone providers may include records of calls made to and from the telephone number(s) associated with the **Subject Phones**. As such, the cellular phone numbers and identities of the cellular telephone companies obtained from a search of the **Subject Phones** would enable the government to obtain information from the cellular telephone companies revealing calls made to and from the **Subject Phones** during the course of the commission of the narcotics offenses.

43. Through experience as a law enforcement officer and through the experience of other law enforcement officers as conveyed to me, I have learned that individuals involved in criminal offenses, including conspiracies to possess and distribute narcotics, commonly use cellular telephones as a means to communicate.

Indeed, SUGGS was in possession of **Subject Phone 1** at the time of his arrest, and **Subject Phone 2** was in the same room as and in the presence of the Subject Parcel's packaging. Individuals involved in criminal offenses, including conspiracies to possess and distribute narcotics, also often store telephone numbers and names or nicknames of fellow conspirators on their telephones and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. Because, as explained above, the **Subject Phones** are associated with the target in this case, and because, in my experience and in the experience of other agents, defendants use telephones to contact co-conspirators, there is probable cause to believe the Subject Phones, described further in Attachment A, contain evidence of violations of narcotics.

## III.   SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

44.    Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

14

a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

45. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications

software which may have been used to create the data (whether stored on hard disk drives or on external media).

46.     In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## IV.   PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

47.     Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

48.     The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

        a.      examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.      surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B; and

d.      opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

49.     The government will return any electronic storage media removed from the premises described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## V.     CONCLUSION

50.     Based on the above information, I respectfully submit that there is probable cause to believe that narcotics offenses, in violation of Title 21, United States Code, Sections 841 and 846, have been committed, and that evidence and

17

instrumentalities relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Phones**, as further described in Attachment A. I therefore respectfully request that this Court issue a search warrant for the **Subject Phones** more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

       FURTHER AFFIANT SAYETH NOT.

                                             _____
                                             David LaMonte
                                           Postal Inspector
                                           U.S. Postal Inspection Service

Sworn to and affirmed by telephone 16th day of February, 2022

_____
Honorable JEFFREY COLE
United States Magistrate Judge

18

## ATTACHMENT A

## DESCRIPTION OF SUBJECT PHONE 1

One black "One Plus" model BE2015 cellular phone in a black and grey case, bearing IMEI number 990017114353440, depicted in the following photographs:

 

## DESCRIPTION OF SUBJECT PHONE 2

One grey T-Mobile cellular telephone with a cracked screen, bearing IMEI number 015727005663399, depicted in the following photographs:

 

**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED**

Evidence and instrumentalities concerning violation of Title 21, United States Code, Sections 841 and 846, as follows:

1.      All names, aliases, and numbers stored in the phones, including the number associated with the **Subject Phones** and any number directory stored in the memory of the phones that provides information regarding the identities of the participants and/or coconspirators involved in violations of Title 21, United States Code, Sections 841 and 846.

2.      All telephone calls made or received located in the memory of the **Subject Phones** that provide information regarding the identities of and the methods and means of operation and communication by the participants and/or coconspirators involved in violations of Title 21, United States Code, Sections 841 and 846.

3.      All text messages made or received located in the memory of the **Subject Phones** that provide information regarding the identities of and the methods and means of operation and communication by the participants and/or coconspirators involved in violations of Title 21, United States Code, Sections 841 and 846.

4.      All digital photographs located in the memory of the **Subject Phones** that contain images of the proceeds of, participants and/or coconspirators involved in

violations of Title 21, United States Code, Sections 841 and 846, associates of the user, or users, of the phone, and areas frequented by the user, or users, of the phones.

5.     Internet and search history located in the memory of the **Subject Phones** relating to violations of Title 21, United States Code, Sections 841 and 846.

6.     Passwords, encryption keys, and other access devices that may be necessary to access the **Subject Phones**.

7.     Any SIM card located within the **Subject Phones** that helps to identify the cellular telephone number associated with the phones.

## ADDENDUM TO ATTACHMENT B

The government's review of electronic storage media, including cell phones, already in its possession shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of electronically stored information and electronic storage media described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.

AO 93  (Rev. 11/13) Search and Seizure Warrant                                    AUSA Chester Choi, (312) 697-4037

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Search of:

The two cellular telephones, further described in
Attachment A

Case Number: 22M130

## SEARCH AND SEIZURE WARRANT

To: David LaMonte and any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of Illinois:

**See Attachment A**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

**See Attachment B**

**YOU ARE HEREBY COMMANDED** to execute this warrant on or before <u>March 3, 2022</u> in the daytime (6:00 a.m. to 10:00 p.m.).

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the issuing United States Magistrate Judge.

Date and time issued: <u>February 17, 2022    10:20am</u>

_____
*Judge's signature*

City and State: <u>Chicago, Illinois</u>

<u>JEFFREY COLE, U.S. Magistrate Judge</u>
*Printed name and title*

AO 93 (Rev. 11/13)  Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No: | Date and Time Warrant Executed: | Copy of Warrant and Inventory Left With: |

Inventory made in the presence of:

Inventory of the property taken and name of any person(s) seized:

## Certification

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

## **DESCRIPTION OF SUBJECT PHONE 1**

One black "One Plus" model BE2015 cellular phone in a black and grey case, bearing IMEI number 990017114353440, depicted in the following photographs:

 

## **DESCRIPTION OF SUBJECT PHONE 2**

One grey T-Mobile cellular telephone with a cracked screen, bearing IMEI number 015727005663399, depicted in the following photographs:

 

## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

Evidence and instrumentalities concerning violation of Title 21, United States Code, Sections 841 and 846, as follows:

1.      All names, aliases, and numbers stored in the phones, including the number associated with the **Subject Phones** and any number directory stored in the memory of the phones that provides information regarding the identities of the participants and/or coconspirators involved in violations of Title 21, United States Code, Sections 841 and 846.

2.      All telephone calls made or received located in the memory of the **Subject Phones** that provide information regarding the identities of and the methods and means of operation and communication by the participants and/or coconspirators involved in violations of Title 21, United States Code, Sections 841 and 846.

3.      All text messages made or received located in the memory of the **Subject Phones** that provide information regarding the identities of and the methods and means of operation and communication by the participants and/or coconspirators involved in violations of Title 21, United States Code, Sections 841 and 846.

4.      All digital photographs located in the memory of the **Subject Phones** that contain images of the proceeds of, participants and/or coconspirators involved in

violations of Title 21, United States Code, Sections 841 and 846, associates of the user, or users, of the phone, and areas frequented by the user, or users, of the phones.

5.    Internet and search history located in the memory of the **Subject Phones** relating to violations of Title 21, United States Code, Sections 841 and 846.

6.    Passwords, encryption keys, and other access devices that may be necessary to access the **Subject Phones**.

7.    Any SIM card located within the **Subject Phones** that helps to identify the cellular telephone number associated with the phones.

## ADDENDUM TO ATTACHMENT B

The government's review of electronic storage media, including cell phones, already in its possession shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of electronically stored information and electronic storage media described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.